IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

HEIDI SCHILLING,

                    Plaintiff,                    OPINION AND ORDER

    v.

                                                    13-cv-438-wmc

THE EPIC LIFE INSURANCE COMPANY,

                    Defendant.

Pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Action of 1974 ("ERISA"), plaintiff Heidi Schilling seeks to recover long-term disability insurance benefits from defendant The EPIC Life Insurance Company. Before the court are the parties' cross-motions for summary judgment. (Dkt. ##12, 18.) The parties agree that this court should review defendant's termination of plaintiff's benefits under an arbitrary and capricious standard. Because the court concludes that defendant substantially complied with the procedural requirements of ERISA and offered a reasoned explanation for its determination that Schilling could work full-time in a sedentary position, the court will grant defendant's motion for summary judgment.

UNDISPUTED FACTS[1]

**A. The Parties**

Plaintiff Heidi Schilling was employed at Attic Angel Place for approximately five years. During the course of her employment, Schilling became eligible for certain

---

[1] The court finds the following facts material and undisputed, unless otherwise noted.

employee benefits, including the opportunity to apply for long-term disability insurance ("LTDI") benefits as provided by the Attic Angel Place Long Term Disability Benefits Plan ("the Plan").  Defendant The EPIC Life Insurance Company ("Epic") is the Insurer of the Plan.

### B.  Overview of LTDI Benefits under the Plan

At all times material to this case, the Plan has been in full force and effect.  Under the Plan, a participant (described as "you") will be paid LTDI benefits if:

1.  You become disabled while insured under the policy;

2.  You are disabled throughout the elimination period;

3.  You remain disabled throughout the elimination period;

4.  You are, and have been during the elimination period, under the regular care of a physician; and

5.  You submit proof of loss satisfactory to us.

(AR at WPS_001442.)[2]

The Plan defines "disability" or "disabled" as follows:

1.  during the elimination period, you are prevented from performing one or more of the essential duties of your occupation;

2.  for 24 months following the elimination period, you are prevented from performing one or more of the essential duties of your occupation, and as a result, your current monthly earnings are less than 80% of your indexed pre-disability earnings;

---

[2] A hard copy of the administrative record was filed under seal with the court.  (Affidavit of Judith Rose (dkt. #17), Ex. A.)

3. after that, you are prevented from performing one or more of the essential duties of any occupation.

(*Id.* at WPS_001437.)

The Plan further defines "any occupation" as:

any occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your indexed pre-disability earnings and the benefit percentage and the maximum monthly benefit shown in the Schedule of Benefits.  Any occupation does not mean the specific job you are performing for a specific employer or at a specific location.

(*Id.*)[3]  Finally, the Plan defines "essential duty" as:

[a] duty that you're required to perform as part of your job with your employer for compensation and that: (1) is substantial, not incidental; (2) is fundamental or inherent to the occupation; and (3) can not be reasonably omitted or changed.  To be at work for the number of hours in your regularly scheduled workweek for your employee is also an essential duty.

(*Id.* at WPS_001438.)[4]  Epic is responsible for paying out any benefits provided under the Plan.  Among other reasons, the Plan directs Epic to terminate benefits on "the date you are no longer disabled as defined in the policy," (AR at WPS_001443) while giving Epic "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the policy."  (AR at WPS_000012); *see also* AR at WPS_000004 ("EPIC has the sole and exclusive right to interpret and apply the

_____

[3] Schilling's "benefit percentage" is 60 percent.

[4] The Plan also requires beneficiaries to apply for Social Security disability benefits and reserves the right to reduce LTDI benefits by an estimated amount of Social Security disability benefits.  (Pl.'s PFOFs (dkt. #15) ¶ 17.)

policy's terms, conditions, limitations, exclusion and all other provisions of the policy . . . .").)  The Plan also provides that Epic may "[a]t any time, . . . at our sole discretion, give certain discretionary authority to other persons or entities providing administrative services to us in regard to the policy." (*Id.* at WPS_000004.)[5]

### C. Schilling's Education and Employment History

Schilling graduated from high school in 1990.  She has an associate's degree in applied sciences from Madison Area Technical College and is certified as a nurse assistant/medication administrative assistant.  Before her employment at Attic Angel Place, Schilling worked as a medication administrative assistant, certified nursing assistant, pharmacy technician, and in various childcare positions.

Schilling worked as a medication administrative assistant at Attic Angel Place from May 16, 2005, until December 27, 2009, when a "constellation of symptoms relating to a back injury and fibromyalgia flare" prevented her from continuing.  (Pl.'s PFOFs (dkt. #15) ¶ 23.)

On January 3, 2011, Schilling began a part-time job, with accommodations, as a cashier at Sauk Prairie Liquor store.  She often works less than 18 hours per week and at most 24 hours per week.  Sauk Prairie Liquor allows Schilling to miss work shifts if her

---

[5] This latter plan provision is material because Epic claims to have delegated to The Hartford responsibility for reviewing eligibility, determining benefits and appeals of claim denials.  Plaintiff disputes this proposed finding based on Epic's name being on the termination and appeal determination letters among other communications.  (Pl.'s Opp'n to Def.'s PFOFs (dkt. #27) ¶ 19.)  The court will address this below in the discussion on Epic's dual role.

fibromyalgia flares up, permits her to take extra rest periods, changes her position as needed, assists her with strenuous tasks, and generally assigns her lighter duties.

### D. Schilling's Medical Conditions

Over time Schilling has been diagnosed with the following medical conditions: fibromyalgia, chronic pain, failed back syndrome, arthritis in the lower back, hip bursitis, depression and anxiety.[6]  As a result of these ailments, Schilling experiences the following symptoms:  pain in her neck, arms, shoulders, hands, back, hips, legs and feet; swelling in her hands, legs, feet and face; muscle cramping; weakness; frequent migraine headaches; difficulty sleeping; decreased mobility; occasional dizziness; and fatigue.   For these ailments, Schilling has been prescribed Lyrica (for management of fibromyalgia), Hydrocodone (pain medication), Cyclobenzaprine (muscle relaxant), Zomig (for management of migraines), and Zofran (anti-nausea medication).[7]  These medications cause dizziness, drowsiness, foggy thinking, memory difficulty, gastrointestinal upset and lethargy.

Plaintiff submits extensive proposed findings of facts on her medical condition from 2009 through 2011.  There is no dispute that she was disabled during this time period.  Indeed, plaintiff was approved for LTDI benefits under the Plan and received

---

[6] "Failed back syndrome (FBS), also called 'failed back surgery syndrome' (FBSS), refers to chronic back and/or leg pain that occurs after back (spinal) surgery, usually after laminectomy.  It is characterized as a chronic pain syndrome."  "Failed back syndrome," Wikipedia, http://en.wikipedia.org/wiki/Failed_back_syndrome (last visited Feb. 27, 2015).

[7] *See* RxList, http://www.rxlist.com/script/main/hp.asp (last visited Feb. 27, 2015).

those benefits until September 2012.  As such, the court will briefly review her medical records from 2009 to 2011, while focusing on her medical condition in 2012.

In January 2009, while still employed by Attic Angel Place, Schilling reinjured her back.[8]  At that time, she reported lower back pain radiating down her left lower extremity into her heel and also in her right lower extremity.  On January 30, 2009, Dr. Amanda Preimesberger treated Schilling for chronic back pain and "diffuse tenderness to the touch of the lumbar spine."  A February 2, 2009, MRI showed degenerative disk disease at L4-L5 and to a lesser extent at L3-L4, as well as a disk bulge at L3-L4 with mild mass-effect in the thecal sac and mild sacral neuritis.

On February 6, 2009, Schilling began treatment with Dr. Michael D. Snyder, a neurologist, reporting lower back pain and neuropathic pain in her legs.  In March 2009, Dr. Snyder prescribed Nerontin (for management of postherpetic neuralgia) and Cymbalta (an anti-depressant).[9]  By October 2009, Schilling's joints began to hurt more and she was having trouble getting through her work days.  In December 2009, Dr. Snyder noted that a tender point test revealed that she remained positive for fibromyalgia, her affect was depressed and she had some psychomotor retardation.

Throughout 2010, Schilling's medical records describe fibromyalgia flares and pain in her lower back, neck, shoulders, arms, hips and legs.  In January 2010, Dr. Snyder

---

[8] In 2000, Schilling injured her back at work when she was trying to lift a resident.  In 2000 and 2001, Schilling had two laminectomies at L4-L5. "A laminectomy is a surgical procedure that removes a portion of the vertebral bone called the lamina." "Laminectomy, Wikipedia, http://en.wikipedia.org/wiki/Laminectomy (last visited Feb. 27, 2015).

[9] *See* RxList, http://www.rxlist.com/script/main/hp.asp (last visited Feb. 27, 2015).

referred Schilling to Advanced Pain Management.  At that time, Schilling reported that her pain was aggravated by bending, sitting, coughing, sneezing, lifting and driving.  She also reported bladder incontinence, bowel incontinence, night pain and chills.  Dr. Maher Fattouh with Advanced Pain Management diagnosed Schilling with lumbar radiculitis and failed back syndrome.[10]  On January 18, 2010, Schilling began physical therapy.  The treatment notes reveal that Schilling had decreased hamstring range of motion, weakness in her lower extremities and tenderness in her upper body muscles.

In January 2010, Schilling also saw Dr. Preimesberger for continued lower back pain, muscular shoulder pain and problems sleeping.  Schilling reported that the pain interfered with her ability to perform usual housework.  She also reported waking up every two to three hours during the night and crying often.  During 2010, Schilling received counseling and attended a fibromyalgia support group.  In addition to physical therapy, Schilling did warm water exercises in a pool at Cedarberry Inn.[11]

Schilling also saw Dr. Snyder in July 2010, during which she reported chronic lower back pain, as well as migraines and chronic pain from fibromyalgia.  Beginning in September 2010, Schilling began seeing Nurse Practitioner Rita Bindl for chronic pain from fibromyalgia.  A December 23, 2010, tender point test conducted by Bindl revealed 14 out of 18 tender points.

---

[10] "Radicular pain, or radiculitis, is pain 'radiated' along the dermatome (sensory distribution) of a nerve due to inflammation or other irritation of the nerve root (radiculopathy) at its connection to the spinal column."  "Radicular pain," Wikipedia, http://en.wikipedia.org/wiki/Radicular_pain (last visited Feb. 27, 2015).

[11] This place is noteworthy given defendant's surveillance efforts discussed below.

During 2011, Schilling continued to see Nurse Practitioner Bindl for a variety of symptoms, including fibromyalgia, failed back syndrome, pain in her neck, back, left leg, and hips, occasional migraines, depression, memory difficult, foggy thinking, nausea, pain in her hips radiating to her thighs, decreased mobility, difficulty sleeping, weakness, fatigue, and occasional dizziness.  Plaintiff does not, however, direct the court to any treatment notes for the first half of 2012.

On July 6, 2012, Schilling was treated by Physician Assistant Rachel Kadverek for shoulder and neck pain as a result of a fibromyalgia flare-up.  On August 20, Schilling saw Nurse Practitioner Bindle again, reporting increased shoulder pain.  At that time, Schilling was referred to Becki Braund for physical therapy for six weeks.  In a September 11, 2012, note, Braund recorded that Schilling's shoulder pain had improved, but that she had experienced a mild/moderate fibromyalgia flare-up the previous weekend.  On October 4, Schilling saw Bindl, complaining of chronic pain, muscle spasms, anxiety and fatigue.  During this period, Schilling was continuing with physical therapy, home exercises and warm water exercises.

### E.  Schilling's Claim for LTDI Benefits

#### 1.  Initial approval of LTDI Benefits

Schilling applied for and received her short-term disability benefits.  When those benefits were exhausted, she applied for LTDI benefits.  In April 2010, Epic notified Schilling that she had been found disabled as of December 28, 2009.  Consistent with the Plan, EPIC approved Schilling's claim for LTDI benefits commencing April 3, 2010, the date on which her short-term disability benefits were exhausted.  Schilling's monthly

8

LTDI benefit amount was $1,844.31, representing 60% (her "benefit percentage") of her pre-disability monthly earnings of $3,073.85.[12]

Schilling continued to receive LTDI benefits for an additional two years until April 3, 2012, because she could not perform the material duties of her *own* occupation. As of that date, however, the definition of "disability" under the Plan changed, requiring that Schilling now be "prevented from performing one or more of the essential duties of *any* occupation." (AR at WPS_000847 (emphasis added).) Schilling's benefits were continued under this new standard until September 19, 2012, when defendant purported to terminate her LTDI benefits effective September 1, 2012.

### 2. Termination of LTDI Benefits

In the September 19, 2012 letter to Schilling, Epic explained that she no longer met the Plan's definition of "disabled." In support of its denial, Epic principally relied on video surveillance, an in-person interview with Schilling, an independent record review conducted by Dr. Ivo Tremont, and an employability analysis performed by Epic's vocational rehabilitation clinical case manager.[13] Based on this information, Epic concluded that: (1) Schilling could perform work at the light-duty demand level; and (2) there were a number of jobs available to Schilling for which she is qualified. The

---

[12] As a result of Schilling receiving SSDI benefits beginning in October 2011, Epic reduced Schilling's monthly LTDI benefit award by $1,168 per month effective June 1, 2010. Plaintiffs represents that defendant "was able" to recover an additional overpayment of $15,856.00, but it is not clear whether defendant did so. (Pl.'s PFOFs (dkt. #15) ¶ 128.) This uncertainty, however, is not material to the present action.

[13] Epic maintained that other supporting documents exist in Schilling's file, but does not develop these in its letter.

termination letter did not state that it believed Schilling could perform sedentary work (but as defendant points out -- and as discussed below -- a finding that one can perform light duty work necessarily subsumes a finding that one could perform less strenuous sedentary work). The termination letter also did not state that there were sedentary positions available to her based on her education, training or experience, nor that she could earn greater than 60% of her predisability earnings in those positions.

The termination letter did address Schilling's receipt of SSDI, noting that "it is possible to qualify for SSD but no longer continue to qualify for private long-term disability benefits" because the SSA "measures your condition against a unique set of federal criteria" and, as such, Epic "considers the SSA's disability determination as one piece of relevant evidence," but it is "not conclusive." (AR at WPS_000683.)

Finally, the termination letter explained that Schilling could appeal Epic's decision, and as part of the appeal, could "submit written comments, documents, records, and other information related to your claim." (*Id.* at 000687.)

### 3. Administrative Appeal

On March 15, 2013, Schilling, now represented by counsel, filed an appeal of Epic's decision terminating her benefits. Included with her appeal were statements from Schilling, her mother, her daughter and the owner of Sauk Prairie Liquor Store. Schilling also included a Fibromyalgia Medical Source Statement completed by Nurse Practitioner Bindl in November 2012,[14] updated medical records, and the Social Security award

---

[14] Bindl's statement is described below in Facts F.3.

10

letter.  In her letter, Schilling's counsel argued that the medical evidence and the Social Security decision supported a finding of continued disability.  Counsel also argued that the surveillance video is not dispositive and that Dr. Tremont's review was selective and lacked support.  Citing Bindl's statement in support, counsel specifically asserted that Schilling could not perform full-time light duty work.

By letter dated June 12, 2013, Epic upheld its determination to terminate Schilling's LTDI benefits as of September 1, 2012.  In this appeal determination letter, Epic stated, "the medical and vocational information in [Schilling's] claim file did not substantiate that she continued to satisfy the definition of disability set forth in the Policy as of the date."  (AR at WPS_000163.)  At minimum, Epic stated that Schilling could work full-time in a sedentary capacity (in contrast to its broader position in the original termination letter that she could work in a light duty job).

The appeal determination letter primarily focused on findings by Drs. Ash and Celli -- two physicians retained by Epic to review Schilling's medical record.[15]  There is no indication in the appeal determination letter that Epic reviewed and considered the November 2012 Fibromyalgia Medical Source Statement completed by Nurse Practitioner Bindl.  Plaintiff contends that the letter also did not "comment" on the arguments in her appeal.  (Pl.'s PFOFs (dkt. #15) ¶ 211.)  Plaintiff further contends that the letter did not "address" SSA's determination that Schilling is disabled.  (*Id.* at ¶ 212.)

In response, defendant points out that the appeal determination letter incorporated by reference its original termination letter which explained the varying

---

[15] These reports are discussed below in Facts 4.c and 4.d.

standards.  (Def.'s Resp. to Pl.'s PFOFs (dkt. #25) ¶ 212.)  The letter also refers to the September 2012 employability analysis report (also discussed below) in determining that Schilling could perform full-time work at 60% of her pre-disability compensation.   As discussed, that report assumed Schilling was able to perform light-duty work, not just sedentary work.   Finally, the letter stated that "our claim decision is now final as administrative remedies available under the policy have been exhausted."   (AR at WPS_000168.)

### F. Restrictions and Limitations

#### 1. Schilling's Self Reporting

In an October 6, 2012, personal statement, Schilling represented that her activities of daily living are limited due to pain and fatigue.  (AR at WPS_000284 to 286.)  On a typical day, Schilling reported that she has to lie down and rest multiple times due to pain and exhaustion.  While Schilling experiences pain every day, she acknowledges that the degree of pain varies, but asserted that this made her unreliable. For example, Schilling has had to cancel plans and call in sick to work due to pain.

On good days, Schilling reported being able to care for herself reasonably and engage in activities such as taking her dog for a walk, completing light chores such as dishes, driving short distances, and performing her part-time job.  On very painful days, however, Schilling reported relying on the assistance of friends and family members with activities such as changing clothes, bathing, cooking meals, and getting in and out of bed. (*See Id.* at WPS_000287 to 289.)  On those days, she is confined to her house and must rest.

12

Schilling also reported that her pain restricts her ability to sit, stand and engage in activities.  Schilling represented that she could only sit for 20 to 30 minutes at a time before she has to change positions, stand for approximately 10 to 20 minutes at a time, and drive for no more than 30 minutes.  Schilling also stated that she uses a number of assistive devices to help her function, including a chair and grab bars in the shower, a "reacher," a long-handed shoe horn, a walker, and a wheelchair on bad days.[16]

### 2.  Video Surveillance

Epic retained the Robinson Group to conduct video surveillance of Schilling on four nonconsecutive days in March 2012.  Epic paid a total of $3,367.00 for this surveillance.  The Robinson Group conducted over 40 hours of surveillance and produced approximately 25 minutes of video footage.  The video shows Schilling:  taking out her trash; tossing a ball to her dog using a "ball launcher"; driving, entering and exiting her vehicle; going in and out of the Cedarberry Inn Hotel (for, as plaintiff represents, aqua therapy); and working part-time at a liquor store.  (Affidavit of Judith Rose (dkt. #17), Ex. B.)  The video also shows Schilling standing, driving, walking, kneeling, and manipulating objects with her bilateral upper extremities without apparent difficulty.  In short, the video shows that Schilling was "active" (i.e., engaged in some activity outside

---

[16] Schilling also completed claimant questionnaires in May 2010 and October 2011 in which she reported respectively that she could get out of bed, eat, clean the house a bit, exercise a little, and play with pets, and prepare meals, care for her dog, run errands, perform light yard and work independently.   (AR at WPS_001179-82; AR at WPS_000618-19.)

of her house on each day in which surveillance was performed).   (Def.'s PFOFs (dkt. #20) ¶ 33.)

Schilling admitted performing these activities in questionnaires she completed for Epic and in her in-person interview.   Specifically, Schilling reported that she:  goes to Cedarberry Inn Hotel four to five times per week to perform aqua therapy; walks her dog; can drive short distances (less than 30 minutes); does not have difficulty getting in and out of her vehicle; and works part time at Sauk Prairie Liquor.   At the time of her interview, Schilling was not advised of the surveillance video activity.   Schilling also reported that she could lift up to a 30 pack of beer on a good day.

Epic also sent copies of the surveillance results and the interview statement to Dr. Snyder and Nurse Practitioner Bindl.   Dr. Snyder responded that Schilling should not lift greater than 20 pounds, and Bindl did not respond.

### 3.  Opinions of Treating Physicians

Plaintiff submits, and defendant does not dispute, that Schilling's doctors have not submitted any written documentation stating that Schilling can perform full-time sedentary work.   On August 24, 2010, Nurse Practitioner Bindl completed a Physical Capacity Evaluation form in which she stated that Schilling could work a six-hour work day with restrictions, including sitting six hours per day, standing 20 minutes three times per day for a total of one hour, walking 20 minutes three times per day also for a total of one hour.   In a letter accompanying that report, Bindl also stated that she believed Schilling could work six-hour work shifts, unless she experienced a relapse with her fibromyalgia.   Epic does not dispute Bindl's 2010 report, but contends that Bindl

14

currently takes the position (or did so in 2013) that Schilling is capable of performing full-time sedentary work based on her agreement with a consulting physician.  (Def.'s Resp. to Pl.'s PFOFs (dkt. #25) ¶¶ 95-96.)[17]

In his December 6, 2010, response to a questionnaire from Epic, Dr. Snyder indicated that he agreed with Bindl's assessment, except that he did not believe Schilling should lift more than 20 pounds on a regular basis.  Bindl also completed a second Physical Capacities Evaluation on September 8, 2011.  In that report, Bindl indicated that in an eight-hour work day, Schilling could sit for six hours, stand for one hour and walk for one hour, alternating positions was tolerated.  Bindl further indicated that she now believed Schilling could "never" lift or carry over 20 pounds.  (AR at WPS_000871.) In an October 17, 2011, questionnaire from Epic, Bindl also disagreed that Schilling "is currently able to perform Sedentary Work on a full time-basis."  (*Id.* at WPS_000417.) At the end of the questionnaire, Bindl indicated that Schilling "would be able, at most on a good day, to do sedentary work for four to five hours per day."  (*Id.* at WPS_000418.)

Once again, defendant does not dispute Bindl's 2011 reports.  Rather, Epic contends that Bindl later changed her opinion and told a consulting physician that she believed Schilling *could* perform full time sedentary work with the necessary restrictions and limitations.  (Def.'s Resp. to Pl.'s PFOFs (dkt. #25) ¶ 103.)  Plaintiff urges the court to reject this contention as inadmissible hearsay.  (Pl.'s Reply to Pl.'s PFOFs (dkt. #32) ¶ 103.)

---

[17] Plaintiff urges the court to reject defendant's response as inadmissible hearsay.  (Pl.'s Reply to Pl.'s PFOFs (dkt. #32) ¶¶ 95-96.)  The court will address this dispute below in the opinion.

In a July 2012, Questionnaire from Epic, Dr. Snyder agreed that Schilling:

> would be physically capable of functioning up to 40 hours per week with less physical demands, consisting of the following: No restrictions sitting, occasionally standing and walking. Occasionally lifting up to 10 lbs, and frequently reaching at waist level and fingering/handling/feeling with her bilateral upper extremities/hands.

(AR at WPS_000725.)  On the same Questionnaire, however, Dr. Snyder also indicated that Schilling could not occasionally lift up to 50 pounds, instead recommending that she not lift more than 20 pounds.  (*Id.*)

Plaintiff characterizes Dr. Snyder as agreeing that "Schilling could work up to six hours per day but that he would not recommend that she lift greater than 20 pounds." (Pl.'s PFOFs (dkt. #15) ¶ 106.)  In contrast, the form asked Dr. Snyder to state whether he agreed that Schilling was capable of working "*40 hours* per week" (as compared to 6 hours per day, for a total of 30 hours per week).  Circling the relevant portion of the question, Dr. Snyder checked "yes."  (AR at WPS_000725.)[18]

While Epic appears to have missed the discrepancy between plaintiff's characterization of this report and its true content, it does state that Dr. Snyder indicated in 2013 to both Dr. Ash and Dr. Celli -- the consulting physicians -- that Schilling could return to full-time sedentary work with the necessary restrictions and limitations.[19]   In reply, plaintiff urges the court to disregard this response on hearsay

---

[18] Although this form certainly appears to contradict plaintiff's earlier proposed fact that Schilling's doctors have submitted no written documentation stating Schilling can perform full-time sedentary work, defendant did not dispute this proposed fact.

[19] In response to another proposed finding of fact, defendant directs the court to a 2012 Employability Analysis in support of its contention that Dr. Snyder concluded "Schilling is able to perform full-time work, eight hours per day and 40 hours per week, with the

grounds as well, but also submits a letter from Dr. Snyder dated February 11, 2014, that falls outside of outside of the administrative record.   In the letter, Dr. Snyder purports "to confirm" that:

> my patient, Heidi Schilling, remains on partial disability due to failed back syndrome, fibromyalgia, and chronic fatigue.  It has never been stated that she can work 8 hours/day since her disability declaration in 2010.  She is only capable of part-time employment due to her symptoms and she is only capable of working a maximum of 6 hours/day due to her symptoms.

(Declaration of William E. Parsons, Ex. 1 (dkt. #26-1).)

In November 2012, Nurse Practitioner Bindl also completed a Fibromyalgia Medical Source Statement in support of Schilling's appeal.   In the Statement, Bindl listed Schilling's prognosis as "pain with exacerbations that are unpredictable," checking off the following symptoms: multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, frequent, severe headaches, numbness and tingling, and depression.  (AR at WPS_000290.)  In addition, Bindl indicated that Schilling could sit for 20-30 minutes at a time and stand for 15-20 minutes at a time, but only for a total sitting period of about two hours and a total standing period of about two hours in an eight-hour work day.   Bindl also noted that Schilling would need to take two to three unscheduled breaks during a working day to sit or lie down.   Moreover, Bindl stated on the form that if Schilling were trying to work full time, she likely would be absent from

---

necessary restrictions and limitations."   (Def.'s Resp. to Pl.'s PFOFs (dkt. #25) ¶ 117.) But that analysis references an opinion of Dr. Tremont.  As far as the court can tell -- and defendant did not direct the court to any particular passage -- the report provides *no* support for concluding that *Dr. Snyder* believed Schilling capable of full-time work.

17

work more than four days per month as a result of her impairments.  Defendant again points out that Bindl later communicated to one of the consulting physicians that Schilling could perform full-time sedentary work.[20]

### 4. Opinions of Medical Consultants[21]

#### a. Dr. Cheryl L. Ray

On April 6, 2011, at Epic's request, Dr. Cheryl L. Ray, DO, FACN, performed an independent medical examination of Schilling, including a physical exam.  Dr. Ray determined that Schilling could work six-hour days if she were allowed to alternate positions, with limited standing, balancing, climbing, stooping/bending, crouching, crawling and walking for up to two hours per day.  As part of her report, Dr. Ray noted:

> On musculoskeletal examination, when [Schilling] is not aware she is being tested, I am actually palpating her back and neck which she is giving me additional history, and she does have some chronic soft tissue texture changes in the trapezius bilaterally, but she does not react to these, and these are not tender points.  However, later when she is aware that I am testing trigger points, she has a marked reaction to pull away, and relates that these are tender, which did not occur previously when she was not aware of trigger point testing.  She relates she has tender points to her inner elbow, about the knees, and about the sternum split, all exaggerated responses.

(AR at WPS_000930-31.)

---

[20] Plaintiff urges the court to reject this response as inadmissible hearsay as well, further pointing out that the Fibromyalgia Medical Source Statement was submitted just six months before the information included in Dr. Ash's report.

[21] Drs. Tremont, Ash and Celli all state that the views espoused in their respective reports are independent of the referring agency and that there were no conflicts of interest. (Def.'s Suppl. PFOFs (dkt. #23) ¶¶1-3.)

### b. Dr. Ivo Tremont

On September 12, 2012, Dr. Ivo Tremont, a board-certified neurologist, completed an independent record review, in which he reviewed 287 pages from Schilling's medical file, including an itemized list of 63 documents relating to Schilling's treatment and medical condition, and the video surveillance, although he did not personally examine Schilling.  Based on his review, Dr. Tremont concluded:

> Given the totality of all medical, self-reported, and surveillance information, this patient can reasonably work up to 40 hours a week at a level of light work; that is, exerting up to 20 pounds of force occasionally and/or up to 10 pounds of force frequently or a negligible amount of force constantly to move objects.  This job rated as light work would require walking or standing to a significant degree or when you require sitting most of the time that entails pushing or pulling or arm and leg controls.

> In my opinion, the patient is capable of working eight hours a day for five days, a total of 40 hours per week.  She can stand for one hour at a time with a five-minute rest for a total of two hours in an eight-hour workday.  She can walk for one hour at a time with a 10-minute rest for a total of two hours in an eight-hour workday.  She can sit for one hour at a time with a five-minute break in between for a total of four hours during an eight-hour workday.  The claimant can frequently push, pull, lift and carry 20 pounds or less, but no more than that.  The claimant can also reach above and at shoulder level constantly.  She can also reach at waist level and below waist level always.  She can also bend, crouch, and kneel frequently.  There are no driving restrictions.

Dr. Tremont also noted the following with respect to restrictions and limitations:

> The best medical rationale to return to work is based on [] the normal physical examinations and the video surveillance; the reason for the R/Ls are based on the medical history of a previously hurt spine with two surgical interventions (p.1-20 of report), and the presence of fibromyalgia can easily be reactivated (p.30 and later); Reactivation of fibromyalgia will

> be a setback at work; claimant and treating physicians will be
> back at square one.

(AR at WPS_000721.)

Based on Dr. Tremont's assessment, Epic's vocational rehabilitation clinic case manager performed an employability analysis on September 17, 2012, and determined that Schilling could perform a number of light duty jobs whose median wages are above 60% of her indexed pre-disability earnings.[22] While the report states upfront that "a full-time Light work capacity will be considered," the attached documents identify four sedentary positions, in addition to several light-duty occupations. (AR at WPS_000704, 708 (listing "S" positions of surveillance-systems monitor, hospital-admitting clerk, animal-hospital clerk, and referral clerk, temporary help agency).) In its denial letter, Epic identified only light-duty demand level jobs.

### c.  Dr. Julia Y. Ash

As part of Schilling's appeal, Epic arranged for Dr. Julia Y. Ash, board-certified in Rheumatology, to conduct a further medical file review. Dr. Ash completed the review on May 22, 2013. She reviewed various medical records and forms from Schilling's doctors along with the video surveillance; she did not, however, personally examine Schilling either. Based on the fact that the Fibromyalgia Medical Source Statement completed by Nurse Practitioner Bindl was not included in the list of documents reviewed, plaintiff maintains that Dr. Ash did not consider Bindl's November 2012

---

[22] An employability analysis report also was commissioned in 2010.

statement.  In particular, plaintiff argues that Dr. Ash did not consider the restrictions listed in that statement.

Epic counters that Dr. Ash "necessarily addressed the restrictions listed in the source statement when she spoke with Bindl during her view of Schilling's file."  (Def.'s Resp. to Pl.'s PFOFs (dkt. #25) ¶ 186 (citing AR at WPS_000228 (Dr. Ash's report, describing "[t]eleconference with Rita Bindl, Nurse Practitioner . . . on 5/13/13")).)  Defendant also represents that Bindl "agreed that Schilling is able to perform full-time sedentary work activity with the necessary restrictions and limitations."  (*Id.* at ¶ 186 (citing AR at WPS_000228 (Dr. Ash's report, stating "Ms. Bindl agreed with me that the claimant is able to perform full-time sedentary work activity with restrictions and limitations outlined below in this report")).)  Plaintiff objects to defendant's response as containing inadmissible hearsay and further questions its reliability based on Bindl's November 2012 source statement, limiting Bindl to six hour workdays.  Dr. Ash's notes also contain a reference to a telephone conversation with Dr. Snyder, in which she represents that "Dr. Snyder agreed with me that Ms. Schilling is able to perform sedentary work activity with restrictions and limitations outlined below in this report."  (*Id.*)

In consultation with a co-reviewer, Dr. Doris Celli, Dr. Ash concluded that Schilling is capable of sedentary work activity, with the following restrictions and limitations:  occasional lifting up to 10 lbs., occasional carrying up to 10 lbs., occasional bending below the waist, and no crawling, crouching or kneeling.  Based on the video surveillance, Dr. Ash concluded that "fibromyalgia is not functionally impairing and no

21

additional restrictions or limitations are supported for this diagnosis." (AR at WPS_000233.) Dr. Ash also concluded that Schilling could work "full-time 40 hours per week employment on a reliable and consistent basis in the competitive job market for the period 8/1/12 through the present." (*Id.*) Plaintiff counters that there is no record that Dr. Ash's report was sent to Dr. Snyder or to Bindl. Therefore, neither treating medical provider submitted anything in writing confirming their agreement with Dr. Ash's conclusion.

### d. Dr. Doris Celli

Epic also retained Dr. Doris Celli, board certified in physical medicine and rehabilitation, to conduct a medical review. Dr. Celli completed her review on May 23, 2013. Dr. Celli reviewed various medical records and forms from Schilling's doctors along with the video surveillance, but did not personally examine Schilling. As with Ash, Celli did not list on materials reviewed the November 2012 source statement completed by Bindl and did not expressly address the restrictions noted on that statement. Contrary to defendant's assertion, Dr. Celli's report only indicates that she contacted Dr. Snyder to discuss her diagnosis and recommendation. (*See* Def.'s Resp. to Pl.'s PFOFs (dkt. #25) ¶ 198 (responding that Dr. Celli spoke with Nurse Practitioner Bindl); AR at WPS_000250 (Dr. Celli's report, stating that she contacted "Dr. Snyder, Neurologist, as he was closer to my specialty").) While Dr. Celli stated in her report that Dr. Snyder orally agreed with her recommendation that Schilling could work full time at a sedentary level, there is no record that Celli sent this report to Dr. Snyder, nor that Dr. Snyder not submitted anything in writing confirming this position.

22

In consultation with Dr. Ash, Dr. Celli similarly determined that Schilling could work an eight-hour workday "on a reliable and consistent basis" with the following restrictions and limitations:

> Sitting for one hour at a time, for six hours per day, in an eight-hour workday, with the ability to take breaks to stretch and walk about approximately every half an hour for five-minute break. Standing/walking for half an hour at a time, for one hour total each during the right hour workday. Lifting/carrying and pulling/pushing to a maximum of 10 pounds occasionally. Reaching above the shoulder/below the waist on occasion. Reaching at the waist frequently. Activities as climbing, driving, kneeling, squatting on occasion. Crouching/crawling not allowed. Hand activities (handling, fingering, grasping) without restrictions. If the patient is still taking narcotics/muscle relaxants, she should not work at heights or with moving machinery.

(AR at WPS_000249-50.)[23]

### G. Social Security Administration Findings

On October 28, 2011, the Social Security Administration ("SSA") notified Schilling of its fully favorable decision with regard to her application for Social Security Disability Insurance ("SSDI") benefits. By letter dated November 7, 2011, the SSA determined that Schilling was entitled to SSDI benefits in the amount of $1,168 per month beginning June 2010. In December 2012, approximately three months after Epic terminated Schilling's LTDI benefits, the SSA notified Schilling that it had reviewed her claim and determined that she remained eligible for benefits. Schilling continues to receive SSDI benefits to this day.

---

[23] Epic paid University Disability Consortium a total of $3,675 for the medical reviews performed by Drs. Ash and Celli.

OPINION

## I.  Standard of Review

This court reviews an administrator's decision to deny eligibility for ERISA insurance plan benefits under the arbitrary and capricious standard.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010).  While this standard of review is obviously highly deferential, the Seventh Circuit has cautioned that the court is not a "rubber stamp."  *Holmstrom*, 615 F.3d at 766.[24]  "For ERISA purposes, the arbitrary and capricious standard is synonymous with abuse of discretion."  *Id.* at 767 n.7 (internal citation, quotation marks and alterations omitted).

ERISA requires that "the administrator . . . weigh the evidence for and against [the denial of benefits], and within reasonable limits, the reasons for rejecting evidence must be articulated if there is to be meaningful appellate review."  *Halpin v. W.W. Grainger*, 962 F.2d 685, 695 (7th Cir. 1992) (internal citation and quotation marks omitted).  The court will, therefore, uphold an administrator's decision "if (1) it is possible to offer a

---

[24] While the Seventh Circuit has stated in the past that the decision must be "downright unreasonable" before reversal by a federal court would be appropriate, the court in *Holmstrom* clarified that statement, explaining that the standard of review:

> should not be understood as requiring a plaintiff to show that only a person who had lost complete touch with reality would have denied benefits.  Rather, the phrase is merely a shorthand expression for a vast body of law applying the arbitrary-and-capricious standard in ways that include focus on procedural regularity, substantive merit, and faithful execution of fiduciary goals.

615 F.3d at 766 n.5.

reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass important aspects of the problem." *Militello v. Cent. States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 686 (7th Cir. 2004) (internal quotation marks and citations omitted).

In reviewing a denial or termination of benefits, there are also two core procedural requirements under ERISA: (1) "that specific reasons for denial be communicated to the claimant"; and (2) "that the claimant be afforded an opportunity for a 'full and fair review' by the administrator." *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775 (7th Cir. 2003) (quoting *Halpin*, 962 F.2d at 688-89); *see also* 29 U.S.C. § 1133. Substantial compliance with these two requirements is sufficient to satisfy ERISA. *Hackett*, 315 F.3d at 775; *Halpin*, 962 F.2d at 690.

Plaintiff contends that the court should also consider plaintiff's claim in light of Epic's dual role of determining eligibility and paying benefits. *See Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009) (describing a dual function of having "both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due") (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)). Epic challenges this characterization, asserting that "Schilling's claim and appeal at all times were handled by The Hartford, not be Epic or its employees." (Def.'s Opp'n (dkt. #29) 4.)

In support, defendant directs the court to the affidavit of Judith Rose who avers that she is an appeal specialist with The Hartford and that "EPIC has delegated to The

25

Hartford responsibility for reviewing eligibility for benefits and appeals of claim denials."
(Affidavit of Judith Rose (dkt. #17) ¶ 2.)  In response, plaintiff, however, points out that:
(1) all of the communications about her claim came from individuals employed by "The
EPIC Life Insurance Company," not The Hartford; and (2) even Judith Rose described
herself as an "Appeal Specialist" for "The EPIC Life Insurance Company" in the second
denial letter.  (Pl.'s Reply (dkt. #30) 4.)

In light of Rose's vague representation as to The Hartford's general
responsibilities, as opposed to its specific role with respect to Schilling's claim, and
evidence that Epic played some key roles in determining Schilling's eligibility for benefits,
even if The Hartford also was involved somehow, the court will consider Schilling's claim
in light of its dual role.  That said, this "conflict of interest" does not alter the basic
standard of review -- an abuse of discretion standard still applies --  while the dual role is
"weighed as a factor in determining whether there is an abuse of discretion."  *Glenn*, 554
U.S. at 115 (citing *Firestone*, 489 U.S. at 115) (quotation marks omitted); *see also*
*Holmstrom*, 615 F.3d at 766 (describing this factor as a "key consideration").

## II. Procedural Challenges

The court begins its review with plaintiff's procedural challenges.   ERISA
regulations require that a denial notice must contain: (A) "the specific reason or reasons
for the denial;" and (B) "a description of any additional material or information
necessary for the claimant to perfect the claim and an explanation of why such material

26

or information is necessary." 29 C.F.R. § 2560.503.1(f).  For the reasons that follow, the court finds Epic's denial notice meets both requirements.

### A. Adequate notice of reasons for terminating benefits

Plaintiff contends that defendant failed to provide her adequate notice of the reasons for its denial because it "switched its reasoning for terminating Schilling's claim for LTDI benefits without providing her an opportunity to appeal the new basis for [d]efendant's denial."  (Pl.'s Opening Br. (dkt. #13) 17.)  Specifically, plaintiff takes issue with the shift in defendant's initial denial letter finding that Schilling could perform *light* duty work and its ultimate determination in denying her appeal that she could perform *sedentary* work.

As previously discussed, defendant's determination in its initial denial letter that Schilling could perform light duty work necessarily subsumes a determination that she could perform even less strenuous sedentary work.  In that way, defendant neither relied on a *new* reason for denying her benefits, nor was plaintiff prejudiced by this so-called shift in reasoning.  Schilling's situation stands in stark contrast with that presented in *Feggins*, where the defendant plan administrator "withdrew as justification all three occupations previously relied upon, but asserted that plaintiff was capable of working" a previously-undisclosed occupation.  *Feggins v. Reliance Standard Life Ins. Co.*, No. 11-cv-073, 2013 WL 4782726, at *1-2 (W.D. Wis. Sept. 6, 2013).  In contrast, the employability analysis relied on by defendant here, both in the initial denial and in the denial of her appeal, listed both light duty and sedentary occupations.  (*See* AR at WPS_000704, 708 (listing "S" positions of surveillance-systems monitor, hospital-

27

admitting clerk, animal-hospital clerk, and referral clerk, temporary help agency).)   As such, defendant complied (or at least substantially complied) with ERISA's requirement of providing adequate notice of the reasons for terminating her benefits.

### B.  Adequate notice of additional information necessary to perfect claim

Schilling also contends that defendant failed to identify in its initial denial letter what additional information Schilling could provide to perfect her claim.  However, this notice requirement under 29 C.F.R. § 2560.503-1(f) only applies "when more information is needed for a plan administrator to review the denial of a claim." *Brehmer v. Inland Steel Indus. Pension Plan*, 114 F.3d 656, 661 (7th Cir. 1997).  Where, as here, "the administrator needed no additional information to reach her determination" -- in other words, "no unresolved material factual questions remained" -- there was no need for defendant to identify additional information Schilling could provide to perfect her claim. *Id.* at 661-62.  Indeed, plaintiff failed to even address this procedural challenge in her reply brief, suggesting that even she recognized its lack of merit.

### III.  Substantive Challenges

In addition to her procedural challenges, plaintiff raises the following three substantive challenges to the termination decision: defendant (A) failed to conduct a second vocational analysis as part of the appeal; (B) failed to adequately consider the SSA's finding of disability; and (C) selectively reviewed the medical evidence submitted. Plaintiff's best argument and the primary focus of the parties' submissions is her challenge to defendant's review of the medical evidence, specifically Epic's conclusion

28

that she could reliably work full-time.[25]   The court will briefly touch on the other two challenges, before turning to the primary one.

### A.  Failure to conduct a second vocational analysis on appeal

Plaintiff takes issue with Epic's decision to rely on the original employability report performed in September 2012 as part of its initial termination decision, rather than conduct a second vocational analysis after it determined on appeal that Schilling was restricted to sedentary work.  (Pl.'s Br. (dkt. #13) 31.)  This substantive challenge obviously touches on the procedural one previously addressed.  While the employability report focused on the availability of light duty positions, that report (or at least the documents attached to the report) also identified four sedentary positions.  (AR at WPS_000704, 708 (listing "S" positions of surveillance-systems monitor, hospital-admitting clerk, animal-hospital clerk, and referral clerk, temporary help agency).)  Accordingly, the court finds no error in Epic's reliance on the original employability report in concluding that sedentary jobs were available as part of its denial of her appeal.

### B.  Failure to consider adequately SSA's finding of disability

Next, Schilling argues that Epic failed to offer a "reasonable explanation for discounting" the SSA's finding of disability.  (Pl.'s Br. (dkt. #13) 33 (quoting *Raybourne v. Cigna Life Ins. Co.*, 700 F.3d 1076, 1087 (7th Cir. 2012)).)  In its initial denial letter,

---

[25] The Plan does not appear to require that a claimant be capable of working full-time in order to be not disabled under the terms of the Plan.  The "any occupation" definition, however, requires a certain earnings potential, and the court will assume -- consistent with the parties' treatment of the issue and absent proof of available high-paying part-time work -- that full-time employment is required in order to meet the earnings requirement.

defendant explained that a finding of disability by the SSA is not dispositive of defendant's review, at least in part, because of the different standards that apply in the two settings. Unlike in the social security context, a plan administrator need not explain why it credits reliable evidence that conflicts with the findings of the treating physicians. *See* discussion *infra*.[26] Regardless of whether Epic's explanation somehow falls short, "[w]hen the Social Security Act's disability standard is different from that in the ERISA plan, a Social Security determination is just one more factor for consideration in an ERISA benefits determination." *Black v. Long Term Disability Ins.*, 582 F.3d 738, 748 (7th Cir. 2009).

Moreover, cases in which courts have relied on a SSA finding to hold that a plan administrator acted arbitrarily or capriciously are distinguishable from the facts here. Unlike in *Raybourne*, there is no evidence that Epic facilitated Schilling's SSA application in such a way that Epic should be bound by the outcome or its dual role is implicated. *See Raybourne*, 700 F.3d at 1083 (describing defendant's role in hiring an SSA consultant to assist plaintiff in pursuing his SSA appeal); *Black*, 582 F.3d at 748 (similarly distinguishing case where plan administrator "urged the claimant to argue to the SSA that she could do no work . . . but later ignored the SSA's determination that she was disabled"). In addition, because Schilling's application for social security benefits was granted without having to pursue an appeal and hearing in front of an administrative law

---

[26] To the extent plaintiff takes issue with Epic's failure to request the social security record, plaintiff had a duty to submit evidence in support of her administrative appeal. (AR at WPS_001442 (requiring that claimant "submit proof of loss satisfactory to us").)

judge, there was no ALJ opinion for Epic to weigh and consider as part of its termination decision.

## C. Selective review of medical evidence

### 1. Treating Physicians

In finding Schilling not disabled under the Plan, defendant was required to provide a "reasoned explanation," which reflects consideration of "the relevant factors that encompass the important aspects of the problem." *Militello*, 360 F.3d at 686. As part of this review, defendant "must address any reliable, contrary evidence presented by the claimant," including the opinions of treating physicians. *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397 (7th Cir. 2009); *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."). Unlike in the social security context, however, the opinions of treating physicians do not carry special weight: "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation why they credit reliable evidence that conflicts with a treating physician's evaluation." *Nord*, 538 U.S. at 834.

Schilling nevertheless contends that Epic failed to provide proper weight to the opinions of her treating physicians, namely Dr. Snyder and Nurse Practitioner Bindl. In particular, plaintiff takes issue with defendant's medical consultants' representations in their respective reports that one or both of the treating physicians *agreed* that plaintiff

could work full-time in a sedentary position with certain restrictions or limitations. Plaintiff relies on a declaration submitted by Dr. Snyder in support of her motion for summary judgment to argue that defendant's reliance on Drs. Ash and Celli was flawed. Unfortunately for plaintiff, "[d]eferential review of an administrative decision means review on the administrative record." *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 982 (7th Cir. 1999). While parties may conduct discovery and present new evidence in ERISA cases on *de novo* review, evidence outside of the administrative record is not allowed "where the question is whether a decision is . . . arbitrary and capricious." *Id.*

Putting aside plaintiff's concerns with the medical consultants' representations of Dr. Snyder's or Bindl's views, the record reflects that Dr. Snyder *did* sign off on Schilling working 40 hours per week in his July 2012 Questionnaire. Moreover, that declaration that was before defendant and its medical consultants before the initial termination decision.

Even if Dr. Snyder had not signed-off on Schilling working a 40-hour workweek, a treating physician need not agree with the opinion of a medical consultant conducting an independent record review for a Plan administrator in order for a decision terminating benefits as allowed under the Plan to be upheld. Indeed, many of the benefit termination challenges denied by courts under ERISA, the treating physician's opinion is at odds in some material respect with that of the medical consultant or examiner retained by defendant to review the medical file. *See, e.g. Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 829 (7th Cir. 2009) (affirming district court's denial of relief under

ERISA where the plan administrator "weighed the opinions of its [medical file review] doctor against those of plaintiff's treating physician and made a reasonable choice amount conflicting medical opinions"); *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 607 (7th Cir. 2007) ("[T]he Plan did not act improperly when it looked to, and credited, evidence that conflicted with Mote's treating physicians' opinions as part of its deliberative process in evaluating her claim.").   The fact that plaintiff's treating physicians may disagree with defendant's conclusion that Schilling could work full-time does not alone demonstrate that defendant's determination was arbitrary and capricious.  *See Leger*, 557 F.3d at 832 (reiterating rejection of any presumption that administrator's reliance on physician's opinion who conducted a medical file review as opposed to a physical examination is invalid).   What matters is whether defendant provided a reasoned explanation for finding Schilling not disabled, and this largely rests on whether defendant's medical consultants provide a reasoned explanation for their similar conclusion.

### 2.  Consulting Physician's Opinions

This leads to plaintiff's second challenge.  Not surprisingly, plaintiff takes issue with defendant's medical consultants' opinions, arguing that the opinions lack a reasoned explanation for their conclusions that she could work full time.  In support of the initial decision terminating benefits, defendant relied on the opinion of Dr. Tremont.  His reasoning in support of his conclusion that Schilling could work 40-hours per week is certainly lacking.  In support of his conclusion that Schilling can "return to work," Dr. Tremont only cites "the normal physical examination and the video surveillance."  (AR at

33

WPS_000721.)  Dr. Tremont provides no explanation as to how the video surveillance supports his finding that Schilling can work full time in a light duty occupation. Moreover, the physical examinations by Schilling's treating physician and nurse note her ongoing issues with chronic pain.  Even Dr. Ray -- the only consulting physician who conducted a physical examination before the initial denial -- found Schilling was *not* capable of working more than six hour shifts, even after she noted concerns about Schilling exaggerating symptoms.

Dr. Ash's report, and to a lesser extent Dr. Celli's report, fare much better.  After recounting Schilling's medical history, Dr. Ash explained her findings were based on a review of the surveillance video, medical records, and discussions with Schilling's treating physician and nurse.  To an untrained eye, Schilling's activities on the surveillance video appear consistent with her own self-reported daily activities, and therefore that evidence would seem of "limited utility."  *Marantz v. Permanente Med. Grp., Inc. Long Term Disability Plan*, 687 F.3d 320, 329-30 (7th Cir. 2012).  As a rheumatologist, however, Dr. Ash also picked up on details in the video and linked those details to her conclusions about Schilling's functional abilities.   Specifically, Dr. Ash noted Schilling's "ability to repeatedly bend at waist and below waist level . . . up to 10 to 15 times while playing with the dog," showing "no difficulty with repeated bending at the waist."  (AR at WPS_000232.)  Moreover, Dr. Ash noted that Schilling was seen "carrying up to three bags in one hand without difficulty," "walking without limp or assistive device," and "carr[ying] large empty garbage bag in one hand from curb back to garage."  (*Id.*)

Dr. Ash also effectively summarized Schilling's medical record with respect to her low back problems.  After describing Schilling's history of degenerative disc disease, Dr. Ash noted a "normal nerve conduction study," the lack of any "motor or sensory deficits documented by any of the treating physicians," and "no documentation for lumbar radiculopathy."  (*Id.* at WPS_000231.)  Schilling also relied on Dr. Ray's independent medical examination describing "normal movements when walking, bending and reaching" and her ability to "change from sitting and standing position without difficulty."  (*Id.* at WPS_000232.)  Based on all of this, Dr. Ash concluded that the "functional impairment" from Schilling's low back problems "is minimal if any."  (*Id.*)

As for Schilling's fibromyalgia diagnosis, Dr. Ash relied on Dr. Ray's observation questioning the "reliability of self-reported pain," along with the surveillance video and normal cardiopulmonary, abdominal, neurological and other tests, to conclude that "[e]ven  if fibromyalgia diagnosis is indeed present, it does not significantly impair the functional activities of the claimant."  (*Id.*)

While Dr. Celli extensively quotes from the medical record, her analysis is far more limited.  Still, she similarly relied on the surveillance video to conclude that Schilling "appears to be quite functional."  (AR at WPS_000250.)  Dr. Celli also relied on Dr. Snyder's July 2012 report that Schilling could work full time and her conversation with Dr. Snyder confirming this opinion.  (*Id.*)  At the very least, Dr. Celli's report can be viewed as confirmation of Dr. Ash's conclusion, even if it does not independently offer a reasoned explanation for a not disabled finding.

35

Certainly, Epic's termination of Schilling's LTDI benefits just six months after its decision granting those same benefits under the "any occupation" standard, begs the question as to what changed in the interim to alter defendant's conclusion that Schilling was no longer disabled?  While Schilling's medical records from the first half of 2012 do not reveal treatment for her alleged disabling conditions (which might support a finding of an improvement in her condition), there is no evidence in the record that defendant would have been made aware of this apparent lapse in treatment.  Perhaps Epic defaulted to continuing benefits until it had gathered sufficient information to warrant the denial of benefits.

Regardless, the Seventh Circuit has instructed that a prior determination of disability is simply one factor to be considered and does not create a presumption that the plan administrator's determination is arbitrary and capricious.  *See Leger*, 557 F.3d at 832 ("The fact that a plan administrator has made an initial benefits determination in favor of the claimant is evidence that, at least initially, the administrator believed that the claimant was disabled as defined by the plan. . . . [T]he previous payment of benefits is just one 'circumstance,' i.e., factor, to be considered in the court's review process; it does not create a presumptive burden for the plan to overcome.").

Even considering the conflicting evidence supporting a finding that Schilling may be limited to 6-hours of work per day, the conflict of interest created by Epic's dual role and the 2011 finding of disability by the Social Security Administration, the court concludes that Epic offered a reasoned explanation for terminating Schilling's benefits supported by substantial medical evidence.  Therefore, the court must conclude that its

36

decision denying further benefits was not arbitrary and capricious.  As best explained in Dr. Ash's report, Schilling's functional capabilities had improved sufficiently by late summer of 2012, that neither her lower back pain nor her fibromyalgia prevented her from working on a full-time basis in a sedentary occupation.  At least, Epic provided a reasoned explanation for so finding.

ORDER

IT IS ORDERED that:

1) plaintiff Heidi Schilling's motion for summary judgment (dkt. #12) is DENIED;

2) defendant The EPIC Life Insurance Company's motion for summary judgment (dk. #18) is GRANTED; and

3) the clerk of the court is directed to enter judgment in favor of defendant and close this case.

Entered this 27th day of February, 2015.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge